PATRIC HOOPER (State Bar No. 57343)
BRIDGET A. GORDON (State Bar No. 287098)
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East, Suite 1600
Los Angeles, California 90067-2517
Telephone: (310) 551-8111
Facsimile: (310) 551-8181

Attorneys for Plaintiff Agendia, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| AGENDIA, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ALEX AZAR, SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR JUDICIAL REVIEW OF AGENCY DECISION, Medicare Appeals Council Docket No. M-19-123; ALJ No. 1-2560274302**<br><br>Trial Date:  None Set |

## JURISDICTION AND VENUE

1.  This Court has jurisdiction to review the final Medicare agency decision in this matter pursuant to 42 U.S.C. section 1395ff(b) and 42 CFR section 405.1130.  Jurisdiction also exists, if necessary, under 28 U.S.C. sections 1331 and 1361, to resolve the important constitutional questions raised by this action and to compel the defendant Secretary of Health and Human Services ("Secretary") to comply with the mandatory duties owed plaintiff.

2.  Venue is appropriate in this judicial district under 42 U.S.C. section 1395ff(b), because plaintiff Agendia, Inc. ("Agendia") does business within this judicial district, Irvine, California.

## OVERVIEW

3. Congress and the Secretary are obligated to establish sound and reasonable policies for administering the Medicare program, the federal health insurance program for the aged and disabled. This is especially true for policies determining whether Medicare should "cover," and thus pay for, advances in medicine, such as molecular diagnostic laboratory testing, that provide doctors treating cancer patients with important information to help guide their ongoing treatment of such patients through more precise medical procedures than previously used. As explained further below, such clinical laboratory testing helps to assure personalized medical decision making by those doctors treating individual Medicare beneficiaries, as opposed to being restricted to much less precise, one-size-fits-all treatment protocols.

4. Under the Constitution, public policymaking, including discretionary regulatory decisions governing Medicare coverage, must be made by **Congress,** in the first instance, and implemented by federal **government** agency officials through the appropriate **governmental** policymaking procedures to assure accountability, fairness and uniformity. Unfortunately, however, since at least 2011, Congress and the Secretary have shirked their responsibilities for determining Medicare coverage for molecular diagnostic testing by delegating discretionary regulatory policymaking to private contractors, typically private insurance companies, who are not accountable to the public and who potentially benefit financially from imposing restrictive healthcare coverage and payment policies. And, these private contractors, known as Medicare Administrative Contractors ("MACs") since 2003, use sub-regulatory procedures to establish their Medicare coverage policies unencumbered by governmental rulemaking procedures. This *ultra vires* practices of the MACs perhaps explain, but certainly do not justify, the Medicare program's use of the resulting arbitrary MAC policies in matters such as the present case where, at the urging of a Medicare private contractor, the Medicare Appeals Council

1  reversed the well-reasoned decision of one of the Secretary's administrative law
2  judges, because the administrative law judge had based her favorable decision on
3  duly-enacted Medicare regulations and on the uncontradicted expert evidence in the
4  record rather than deferring to the unlawful and arbitrary policies of the MACs.

5  5. The particular private contractor policy at issue here is embodied in a Medicare Local Coverage Determination ("LCD") and on a MAC "Policy Article" that automatically disallow Medicare coverage for any molecular diagnostic test ordered by a patient's treating physician, unless the test has been "pre-approved" by a sub-regulatory assessment process for molecular diagnostic services administered by a private contractor, known as "MolDx." MolDx was established in August 2013, on an *ad hoc* basis, by a single MAC located in South Carolina known as Palmetto GBA, a private insurance company owned by Blue Cross Blue Shield of South Carolina. The LCD and the related MAC Policy Article continue to prohibit coverage testing conducted by Agendia for Medicare patients residing throughout the Country, as evidenced by the decision in this case.

  6. Agendia and the outside, independent doctors who order Agendia's laboratory testing for their breast cancer patients continue to be adversely affected by the MACs' sub-regulatory policy making as evidenced by the decision of the Secretary's Medicare Appeals Council ("Council") in this case and two other administrative appeals being pursued by Agendia through an expedited judicial review process that is the subject of a related case, *Agendia v. Alex Azar,* Case No. 8:19-cv-00030-DOC-JDE (C.D. Cal.), filed in this court on January 7, 2019. Through these actions, Agendia challenges (a) the authority of Congress and the Secretary to delegate to private contractors' **discretionary**, regulatory policy making, and specifically their authority to do so through LCDs, Policy Articles, and the MolDx process, and (b) the Secretary's 2005 requirement that governmental adjudicators, including the Medicare Appeals Council ("Council"), must give "substantial deference" to the MAC policies stablished by private contractors.  In

the instant appeal, the Council found "no reason to not apply substantial deference to the LCD or to question the MolDX program's findings." The Council also acknowledged that it did not have the authority to address legal challenges to the authority of the MACs to establish Medicare coverage policies through LCDs and MAC Policy Articles. *See* Council's January 7, 2019 final decision (attached as Exhibit A), page 10.

## THE PARTIES

7. Agendia is a Medicare approved, state licensed clinical laboratory located in Irvine, California. As the facts of the instant appeal show, Agendia furnishes advanced diagnostic laboratory testing ordered by physicians for their patients throughout the United States and not only in California. Such advanced diagnostic testing is defined by Medicare as laboratory testing offered and furnished only by a single laboratory and not sold for use by a laboratory other than the original developing laboratory. The testing consists of an analysis of multiple biomarkers of DNA, RNA, or proteins combined with a unique algorithm to yield a single patient-specific result. 42 U.S.C. § 1395m-1(d)(5). The two laboratory tests at issue, BluePrint and TargetPrint, were developed by Agendia using genetic research made possible by the Human Genome Project (1990-2003), an international scientific research project designed to determine the sequence of nucleotide base pairs that make up human DNA, and identifying and mapping all of the genes of the human genome from both a physical and a functional standpoint. The tests are ordered by physicians to help guide their treatment of breast cancer patients.

8. The Secretary is responsible for administering the Medicare program, the federal health insurance program for the aged and disabled. 42 U.S.C. §§ 1395 *et seq*. The Centers for Medicare and Medicaid Services ("CMS") is the federal agency responsible for the day-by-day administration of the Medicare program. As stated above, beginning in 2003, CMS delegated many of its most important functions to MACs.

## THE RELEVANT MEDICARE PROVISIONS

9. Physician and laboratory services are medical services covered by Part B of the Medicare program. *See* 42 U.S.C. §§ 1395j *et seq.*, including 42 U.S.C. § 1395x(s)(3), which requires Medicare coverage for diagnostic laboratory services. Under 42 U.S.C. section 1395u(a), the administration of Part B of the Medicare program "shall be conducted through contracts with medicare (*sic*) administrative contractors under section 1395kk-1 of this title." Section 1395kk-1(a)(4), in turn, expressly includes "developing" LCDs as one of the MACs' delegated functions.

10. An LCD is "a determination by a fiscal intermediary or a carrier [known as MACs effective 2003] . . . under Part B . . .respecting whether or not a particular item or service is covered . . in accordance with section 1395y(a)(1)(A) of this title." 42 Section 1395y(a)(1)(A), in turn, provides that no Medicare payment may be made for any expenses incurred for items and services that are not "reasonable and necessary" for the diagnosis or treatment of illnesses or injury or to improve the functioning of a malformed body member. Thus, this statutory provision essentially requires Medicare to cover and pay for services determined to be reasonable and necessary for the diagnosis or treatment of an illness unless some other express provision of the law or duly enacted regulation provides otherwise. The Secretary has promulgated regulations implementing this provision, including 42 C.F.R. sections 411.15(k) and 410.32(a), which allow coverage for laboratory services if they are ordered by a patient's treating physician for the management of the patient's condition.

11. While Congress has authorized MACs to develop Medicare coverage policy through the issuance of LCDs without specifying the process to be followed in doing so, it requires the Secretary to issue National Coverage Determinations ("NCDs") through a governmental process that is similar to the process required to enact regulations under the rulemaking requirements of the federal Administrative Procedure Act, 5 U.S.C. section 553 ("APA"). *See* 42 U.S.C. § 1395y(*l*)(3). As a

1 result, NCDs are not subject to APA rulemaking provisions.  However, all other
2 Medicare statements of policies and rules that establish or change a substantive legal
3 standard governing the scope of Medicare benefits, arguably including LCDs and
4 MAC Policy Articles, must be enacted as regulations under the APA in accordance
5 with 42 U.S.C. section 1395hh(a)(2).  Yet, MACs do not establish LCDs or MAC
6 Policy Articles in accordance with such APA rulemaking processes.

7       12.    Disputes over the issue of whether particular items or services are
8 reasonable and necessary for the treatment of an illness are commonplace.  In fact,
9 Congress has established an elaborate administrative appeal process to resolve such
10 disputes.  Under 42 U.S.C. sections 1395ff(a) and (b), MACs make "initial
11 determinations" and "redeterminations" concerning whether services for which
12 Medicare claims for payment are submitted by clinical laboratories and other kinds
13 of Medicare providers and suppliers are reasonable and necessary and thus Medicare
14 covered and payable.

15       13.    Under 42 U.S.C. section 1395ff(b), Laboratories may request
16 reconsideration of such "claims determinations" by another private contractor,
17 known as a qualified independent contractor ("QIC").  Thereafter, a laboratory or
18 other provider or supplier of services may request an administrative hearing before
19 one of the Secretary's administrative law judges ("ALJs").  The final step in the
20 administrative appeal process for Medicare claims is an appeal before the Council.

21       14.    The Secretary has established regulations implementing these
22 administrative appeal procedures.  42 C.F.R. §§ 405.900 – 405.1140.  While ALJs
23 and the Council are not bound by LCDs or MAC policy articles in adjudicating
24 Medicare claims appeals, as of 2005, they must give "**substantial deference**" to
25 LCDs, and if they choose not to follow an LCD, they must explain why they did not
26 do so."  Moreover, the ALJs and the Council may not set aside or review the validity
27 of an LCD for purposes of Medicare claims appeals such as those here.  42 C.F.R. §
28 405.1062.  Congress allows Medicare beneficiaries, but not Medicare providers or

suppliers, including laboratories, to challenge the validity of LCDs. 42 U.S.C. §§ 1395ff(f)(2) and (f)(5).

## PROCEDURAL FACTS

15.    In the eighty-six individual patient cases at issue, the medical records presented to the ALJ show (a) that each patient was diagnosed with early stage breast cancer, (b) that her physician ordered the molecular diagnostic testing at issue, BluePrint and/or TargetPrint, for the management of the patient's condition, and (c) that the testing was provided as billed. Such record evidence further shows that the testing results corroborated, supplemented, or contrasted the information in the patient's pathology report, and could be used to guide the physician in plotting the patient's most appropriate course of treatment. With basal type cancer of the breast, once a metastatic event occurs, the cancer becomes incurable. Therefore, accurately identifying the type of cancer at the earliest stages is crucial. Standard pathology procedures did not accurately identify the type of cancer in some cases in the records. For example, by identifying a basal type cancer case, the high toxicity of the most powerful chemotherapy was justified by the likelihood of its effectiveness. In other types of cases, the cancer patient might be spared the risks and the side effects of undergoing chemotherapy when the cancer cells are hormone driven inasmuch as the chemotherapy would not be effective and hormone therapy would be most effective. Peer reviewed medical literature in the record shows that during the time at issue, the tests were not investigational or experimental, but were used to guide treatment by oncologists as a standard practice in early stage breast cancer at the time the services at issue were provided.

16.    From June 25, 2012, through January 25, 2013, Agendia provided BluePrint and TargetPrint testing for the eighty-six Medicare beneficiaries suffering from breast cancer at the request of the patients' treating physicians. Agendia timely submitted claims for Medicare payment for these laboratory tests to Noridian Healthcare Solutions, LLC. ("Noridian"), the MAC responsible for administering

Part B of the Medicare program for laboratories located in California. Noridian denied payment for the testing based on an LCD that had been issued by Palmetto GBA, in 2012, LCD L32288 (orig. det. eff. date May 2012)(now superseded). Among other things, this LCD confirms "non-coverage" for all molecular diagnostic tests that are not explicitly covered by an NCD, an LCD, or a coverage article published by Palmetto GBA and excluded per MolDx Exempt Tests published on the Palmetto GBA website. The MolDx assessment found there to be insufficient evidence to support reasonable and necessary criteria for Medicare reimbursement and thus deemed the BluePrint test to be a "statutorily excluded test" and neither test was on the LCD's list of covered services in the MAC's policy article. Noridian denied Agendia's requests for favorable redetermination for this same reason.

17. Agendia timely requested the QIC (the private contractor responsible for reconsidering MAC redeterminations) to order coverage and payment for the testing at issue. Relying on LCD L32288, MAC policy article A51931 and the lack of approval by MolDx, the QIC denied reconsideration.

18. Agendia then timely requested an ALJ hearing. Due to a large backlog of cases, the Secretary's Office of Medicare Hearings and Appeals did not hold an ALJ hearing until July 2018, several years after Agendia filed its request for such a hearing.

### THE FULLY FAVORABLE AUGUST 22, 2018 ALJ DECISION

19. The first ALJ to consider Agendia's claims at a *de novo* hearing, issued a decision on August 22, 2018, that was "fully favorable" to Agendia. During the hearing, Agendia presented expert testimony from a physician who had been in the private practice of oncology for 30 years, including at Cedars Sinai Medical Center in Los Angeles, regarding the testing at issue and the medical necessity of the same. The record evidence also contained documentation of each treating physicians' orders for the testing and pathology reports describing the breast cancer patients' conditions, as well as the individualized molecular diagnostic test results for each

patient. Additionally, the hearing record included evidence-based scientific articles in effect during the dates of services at issue, which showed that BluePrint and TargetPrint were "more accurate than conventional pathology methods in determining the receptor status and response to treatment in early-stage breast cancer patients."

20. Based on this evidence, the ALJ found that prior to the growth of genetic technology, the medical community was aware that there were three types of breast cancer, all of which were treated by chemotherapy. However, with the growth in genetic technology, tests were developed to be more precise in identifying the type or classification of the individual's cancer, and accordingly, more precise in how to effectively treat an individual's particular cancer. Prior to such developments, there was a 1 in 5 error rate in identifying the type of cancer a patient had. In 2012, both BluePrint and TargetPrint were used in conjunction to help a physician plan a patient's course of treatment. Because there were many gray areas in standard pathology reports, these two tests furnished more precise information that supplemented the pathology reports so that the treating physician could better decide the course of treatment for each particular patient. By 2012, the use of these tests was the standard of care for oncologists. Through the use of three representative patient cases, Agendia's medical expert described in detail the medical necessity of the testing for each patient. The ALJ then applied this reasoning to the evidence in the record for each of the remaining 83 patients.

21. Based on these findings, the ALJ concluded that the "emerging genetic testing provided to the beneficiaries in these cases were medically reasonable and necessary." The ALJ did not ignore the LCD or the MolDx determinations but concluded that the tests at issue were reasonable and necessary for treating the patients' conditions despite such MAC "policies."

22. On October 10, 2018, the QIC requested the Council to review the ALJ's August 22, 2018 decision on the primary ground that the ALJ erred as a

matter of law by "misapplying" LCD L3228 and the MolDx determination. Agendia duly opposed that request.

### THE JANUARY 7, 2018 COUNCIL DECISION

23. Without advising Agendia of its decision to review the ALJ decision, on January 7, 2019, the Council mailed Agendia a "NOTICE OF OWN MOTION REVIEW AND DECISION OF MEDICARE APPEALS COUNCIL," (Exhibit A), which Agendia did not receive until January 11, 2019. After discussing the decisions leading up to its decision, including the August 22, 2018 ALJ decision, the Council concluded that the "ALJ's decision contains an error of law material to the outcome of the claims." Specifically, the Council held that the ALJ's decision "is inconsistent with the LCDs in effect during the dates of service at issue." Council decision, page 10. The Council decided that the ALJ's "departure from the LCD was a result of its misapplication and misunderstanding of the MolDX program," as well as the ALJ's failure to apply Policy Article A51931. And, as stated above, the Council found "no reason to not apply substantial deference to the LCD or to question the MolDX program's findings." *Id.*

### THE COUNCIL'S DECISION IS INVALID.

24. The Council's January 7, 2019 decision is reviewable by this Court under the provisions of the APA, specifically 5 U.S.C. section 706. Under Section 706, a decision of an agency must be set aside if it is (a) arbitrary or capricious and not in accordance with the law, (b) contrary to constitutional right or power, (c) in excess of statutory jurisdiction and other legal limits, or (d) without the procedure required by law.

25. The Council's decision is contrary to the fundamental constitutional principle requiring Congress to make laws and policies. All legislative powers are vested in Congress under Article 1, section 1 of the Constitution. While the details of such policymaking may be delegated to Executive Branch agencies under the appropriate circumstances and pursuant to appropriate standards, Congress may not

delegate discretionary regulatory policymaking to **private contractors** under any circumstances. And, even if Congress could constitutionally allow an agency to delegate such authority to a private contractor, there is no authority allowing Congress or a government agency to require judicial or quasi-judicial decision makers to defer to the policies developed by private contractors. Thus, because Congress has purportedly authorized MACs to make Medicare coverage policies, such as LCD L32288, and because the Secretary's regulations require ALJs to give substantial deference to these policies, which has occurred here, the Council's decision must be set aside.

26. The Council's decision is also contrary to the procedures required by statute to be applicable to the promulgation of Medicare policies under the rulemaking provisions of the APA. Under established case law regarding the APA, as well as under the provisions of 42 U.S.C. section 1395hh, no Medicare policy or rule may be implemented unless it was enacted as a regulation, which requires compliance with APA rulemaking requirements. LCD L32288, Policy Article A51931, and the MolDx program were developed by a MAC, Palmetto GBA, without compliance with such rulemaking requirements and continue to be applied and enforced by MACs throughout the Country, including the MAC (Noridian) that disallowed payment for the claims at issue here.

27. Moreover, the Council's decision in this matter is arbitrary and capricious, not in accordance with the law and unsupported by substantial evidence. For example, the Council's decision is contrary to the requirements of the controlling Medicare regulations, which require Medicare coverage of the tests at issue based on the evidence in the record, including the uncontradicted evidence of Agendia's expert witnesses and the test ordering decisions of the doctors who were treating the eighty-six patients regarding the medical necessity for such testing.

28. Making the constitutional and other legal infirmities even more egregious under the circumstances of this case is the fact that Agendia has been

required to follow the only process permitted by the Secretary's regulations to challenge the application of LCD L32288, Policy Article A51931, and the MolDx program, which process has been inexcusably and prejudicially delayed for years thus depriving Agendia and the Medicare beneficiaries they serve of the full and unencumbered benefits of the critically important testing at issue on a reasonably prompt basis.  Moreover, while Congress has required the Secretary to evaluate and determine which LCDs should be adopted nationally and "to what extent greater consistency can be achieved among" LCDs under 42 U.S.C. section 1395y($l$)(5)(A), Agendia is informed and believes and therefore alleges that the Secretary has either not performed such an evaluation or determination, or if he has done so, has not done so fully and fairly.  For example, for nearly seven years, one particular MAC's policies, that of Palmetto GBA, have dominated Medicare policymaking for the coverage of diagnostic molecular testing and have effectively become a *de facto* NCD (National Coverage Determination) without going through the process required for the Secretary to enact such national Medicare coverage determinations.

   29. The Secretary's own Inspector General has recognized the arbitrary nature of the LCD policy making process.  In a January 2014 report entitled, *Local Coverage Determinations Create Inconsistency in Medicare Coverage*, the Inspector General finds, among other things, (a) that in October 2011, over half of Medicare Part B procedures were subject to an LCD in one or more states, including California, (b) that LCDs limited coverage for the same procedure codes differently across states, and (c) that some MACs issued "blanket LCDs prohibiting coverage of all procedure codes for new technology, stating that they considered new technology to be experimental and thus not covered by Medicare," which is basically what the LCD at issue did in 2011 for molecular diagnostic testing that was not pre-approved by the MAC controlled MolDx process.  U.S. Department of Health and Human Services, Office of the Inspector General. (2014). *Local Coverage Determinations Create Inconsistency in Medicare Coverage* (OEI-01-11-

COMPLAINT FOR JUDICIAL REVIEW OF AGENCY DECISION

00500 at 8-10). Retrieved from https://oig.hhs.gov/oei/reports/oei-01-11-00500.pdf.

**PRAYER**

Wherefore, Agendia prays as follows:

1. For an order from this Court setting aside the decision of the Council and requiring the Secretary to cover and pay for the claims at issue as well as all other similar past, present and future claims of Agendia;

2. For an order awarding Agendia its costs of suit including reasonable attorney's fees; and

3. For such other and further relief as this Court deems necessary and appropriate.

Dated: January 14, 2019          HOOPER, LUNDY & BOOKMAN, P.C.

By: _____
PATRIC HOOPER
Attorneys for Plaintiff Agendia, Inc.

13
COMPLAINT FOR JUDICIAL REVIEW OF AGENCY DECISION